STATE OF MAINE                          BUSINESS AND CONSUMER COURT

Cumberland, ss.

TESTA'S, INC.

                Plaintiff/Counterclaim Defendant

    v.                                                      Docket No. BCD RE-11-03 ✔

JACK COOPERSMITH and SHERRI COOPERSMITH,

                Defendants/Counterclaim Plaintiffs

and

TOURMALINE KING, LLC and TOURMALINE QUEEN, LLC,

                Defendants

and

THOMAS J. TESTA, JR., ANNA T. STRIEFEL
MLS PROPERTIES, LLC, and JOAN E. PURCELL

                Parties-in-Interest

### ORDER AFTER SITE VIEW AND HEARING

By agreement of the parties, the only remaining issue in this case involves the specific terms of the Defendants' easement over the Plaintiff's property for purposes of access to the Defendant's properties. After the Law Court mandate, the parties filed a Joint Motion for Clarification of that point.

Pursuant to a previously issued notice and by agreement of the parties, the court conducted a site view and a hearing June 30, 2015. At the hearing, Plaintiff and Defendants presented evidence in the form of sworn testimony and exhibits. After the close of evidence the court issued several oral rulings and set a schedule for further submissions by the

1

parties. This Order is to set forth that schedule and also to summarize the court's oral rulings for the benefit of counsel in preparing their submissions.

*Procedural Posture*

Because the Business and Consumer Court has issued what is now a final judgment by virtue of being affirmed on appeal, any "clarification" of the final judgment needs to be pursuant to Rule 60(b) of the Maine Rules of Civil Procedure. *See Bonner v. Emerson,* 2014 ME 135, ¶ 10, 105 A.3d 1023, 1026 (Rule 60(b) is the source of trial court's authority to modify final judgment). Although the parties' Joint Motion for Clarification does not mention Rule 60(b), the court will proceed on the basis that the Joint Motion for Clarification invokes the court's Rule 60(b) jurisdiction, and that the parties agree that Rule 60(b)(1) and/or 60(b)(6) authorize the court to issue an amendment to the judgment clarifying the location and scope of the easements. Any objection to the foregoing should be filed in writing within 10 days of this Order, or be deemed waived.

*Format of Amended Judgment*

The court further assumes that the end result of the present procedure will be at least an amendment to the final judgment, and also either a recordable abstract of the amendment or perhaps a separate recordable easement deed for each of the Defendants' two properties. The parties are requested to confer on what documents are involved and what form they should take.

*Summary of Rulings*

The following summarizes the court's oral rulings made at the close of the June 30, 2015 hearing:

- The easements appurtenant to Defendants' properties will allow vehicles operated by persons seeking access to Defendants' properties to travel over any portion of the Plaintiff's parking lot that is now or hereafter accessible to other users of the parking lot, except that no vehicle operated by a person going to Defendants'

2

properties will be permitted to park in any of the Plaintiffs' parking spaces, and vehicles leaving Defendants' property will exit only via the same way they entered, i.e. to Main Street.

- Nothing in the easements will limit the Plaintiff's right to change the parking lot either as to its configuration or its usage, provided however, that the Plaintiff will not reduce the travel way for vehicles to go to and from Defendants' properties below the following minimums:

  - a travel way 13 feet wide at the Main Street entrance to the parking lot
  - a 16 foot-wide rectangular travel way centered on and running lengthwise from the Main Street entrance westerly to the southwesterly corner of the 20-foot wide travel way described below
  - a 20-foot wide rectangular travel way running northerly from the westerly end of the above-described 16-foot wide travel way to the southerly edge of the building at the northwest corner of the parking lot. The easterly side of said 20-foot wide rectangular travel way abuts the 25 x 18 rectangle described in the following subparagraph.
  - a 25 foot by 18-foot rectangular area abutting the 20-foot wide travel way, with the longer sides abutting the 20-foot wide travel way on the west and the Defendants' property lines on the east. Defendants may determine where the 25 x 18 foot area is positioned along Defendants' westerly boundary lines.

The foregoing travel way sections are hereinafter collectively referred to as the "minimum travel way."

- No part of any parked vehicle shall be within or over the above-defined minimum travel way. (See below for potential limited exception for delivery vehicles).

- No vehicle parked on Defendants' property will protrude onto or over Plaintiff's property, and no vehicle parked on Plaintiff's property will protrude onto or over Defendants' property. This means that a vehicle parked on a party's property must be entirely on that party's property and may not overhang another party's property.

*Further Potential Provisions*

The court is considering the following additional provisions and invites the parties'

further input:

- A provision to the effect that delivery vehicles that stop partly or entirely in the above-defined minimum travel way solely for the purpose of making a delivery to a party will not be deemed to be in violation of the easement as long as the delivery vehicle does not interfere with any other vehicles using that portion of the travel way. This means that vehicles making deliveries or pickups for any party could stop anywhere within the Defendants' above-defined minimum travel way as long as they did not block other parties or other users of the parking lot. Such a provision could

3

benefit all parties. Without it, vehicles making deliveries to the Plaintiff's property or the Defendants' properties would be required to stop entirely outside the minimum travel way. The court is open to setting time limits as well.

- A provision requiring the parties to notify each other of any violations

- A provision defining the terms under which the easement can be terminated, but requiring that termination is effective only if ordered by a court with jurisdiction

- A provision authorizing any party to obtain legal and equitable relief for a violation by another party

- The court encourages, but will not require, the parties to include an ADR procedure to be exhausted before any party invokes the aid of the court

- In addition, the documents need to contain standard appurtenant easement language,

- Eventually a metes and bounds description of the "minimum travel way" will be needed, to be included in the easement description and also depicted on a plan.

*Schedule*

The court adopts the following schedule for the parties' further submissions:

By July 22, 2015, Plaintiff will draft and submit to Defendant on behalf of Plaintiff and the parties-in-interest the document or documents that the Plaintiff will be asking the court to adopt.

By July 29, 2015, Defendants will draft and submit to Plaintiff and parties-in-interest the Defendants' response, along with a red-lined version of the Plaintiff's submittals, indicating the Defendants' deletions and additions. If the Plaintiff agrees with any changes made by Defendants, Plaintiff's counsel will endeavor to notify Defendants' counsel prior to August 5.

By August 5, 2015, all parties who wish to file proposed documents for the court's consideration will do so, including memoranda in support of a party's position on any disputed issue of fact or law.

The Clerk will schedule this case for oral argument on the parties' submissions on any available date after August 5, 2015. If all parties agree, the oral argument may be held in

4

Portland with any counsel who wishes able to participate telephonically. Otherwise, the oral argument will be at the court of origin in Ellsworth.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this order by reference in the docket.

Dated July 1, 2015

_____
A. M. Horton
Justice

5

Testa's Inc. v. Jack Coopersmith, Sherri Coopersmith, Tourmaline King, LLC, Tourmaline Queen, LLC, Thomas Testa, JR., Anna Striefel, MLS Properties, LLC and Joan E. Purcell

BCD-RE-11-03

Testa's Inc.

### Plaintiff

Counsel: *Aaron Baltes, Esq.*
Two Canal Plaza
PO Box 4600
Portland, ME 04112-4600

### Jack and Sherri Coopersmith, Tourmaline King, LLC and Tourmaline Queen, LLC,

### Defendants

Counsel: *Gerard Fournier, Esq. and*
*Joshua Randlett, Esq.*
One Merchants Plaza Suite 603
PO Box 2429
Bangor, ME 04402-2429

*David Soley, Esq.*
100 Middle St
PO Box 9729
Portland, ME 04104-5029

### MLS Properties, LLC

### Party-in-Interest

Counsel: *Timothy Bryant, Esq.*
One City Center
PO Box 9546
Portland, ME 04112-9546

### Thomas Testa, JR. and Anna Striefel

### Parties-in-Interest

Counsel: *Douglas Chapman, Esq. and*
*Thomas Wheatley, Esq.*
109 Main St
Bar Harbor, ME 04609

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
Location:     Portland
Docket No.  BCD-RE-11-03

TESTA'S, INC.,

    Plaintiff/Counterclaim Defendant,

v.

**FINAL
DECISION AND JUDGMENT**[1]

JACK COOPERSMITH, et al.,

    Defendants/Counterclaim Plaintiffs,

and

THOMAS J. TESTA, JR., ANNA T. STRIEFEL,
MLS PROPERTIES, LLC, and JOAN PURCELL,

    Parties-in-Interest

On September 9 – 11, 2013, this matter was tried to the Court on Plaintiff's Complaint

and Defendants' Counterclaim. The central issue generated by the complaint and counterclaim is

---

[1] On October 1, 2013, after a bench trial, the Court issued its Decision and Judgment in this matter. In the Decision and Judgment, in determining that Defendants had an easement over Plaintiff's property, the Court declined to address all but one of the theories by which Defendants maintained the existence of an easement. Plaintiff subsequently filed post-trial motions, which motions raised certain substantive and procedural issues. On October 8, 2013, the Court conducted a telephonic conference with counsel to discuss with the parties some of the issues raised in the motions and the future course of the case. One of the issues raised by the motions and during the conference was the possibility that this Court would not be available to address any post-judgment issues that might be generated in the event of an appeal and subsequent remand. Citing the interests of judicial economy, the parties requested that the Court address all of Defendants' theories and any related legal defenses. The Court agrees that judicial economy militates in favor of the Court addressing some of the other issues in the case. The Court, therefore, issues this Final Decision and Judgment, which shall supersede and not be in addition to the October 1, 2013, Decision and Judgment.

1

whether Defendants' property benefits from an easement over Plaintiff's property in Bar Harbor, Maine.[2] After consideration of the evidence, the Court makes the following findings:

## FINDINGS OF FACT [3]

1. Plaintiff owns certain real property located on the westerly side of Main Street in Bar Harbor, Maine, which consists of several contiguous lots (the Testa property).

2. Defendants Coopersmith also own certain property on Main Street in Bar Harbor, Maine, which property they acquired by deed dated November 1, 2005 (the Coopersmith property). Defendants Tourmaline King, LLC, and Tourmaline Queen, LLC, (Defendants Tourmaline), which are now owned by Defendants Coopersmith, own certain property on Main Street in Bar Harbor, Maine, which property is described in a deed dated December 24, 2012 (the Tourmaline property).

3. The Coopersmith property and the Tourmaline property include retail businesses with space for parking immediately behind the building.

4. The deed to the prior owners of the Tourmaline property included a right of way over adjoining property, at least a portion of which is now the Testa property, to permit access to the rear of the Tourmaline property. The Coopersmiths' deed also includes a grant of a right of way.

5. The Coopersmith property consists of the consolidation of two lots. One of the historical lots is located along the westerly side of Main Street. Lot two abuts lot one to the west. The right of way in the Coopersmith deed describes a right over Lot two for the benefit of Lot one.

---

[2] Plaintiff had filed, but withdrew prior to trial, a claim for damages.
[3] The Court will set forth some of the basic facts established at trial. The enumerated facts are not, however, an exhaustive list of all of the Court's factual findings. As part of the Court's analysis in the Discussion section that follows, the Court makes additional findings.

6. For many years, beginning in the 1950's and through and including the mid-1970's, the Coopersmiths' predecessors-in-title accessed the rear of their property over the Testa property for business deliveries and other purposes.

7. In the 1970's, Plaintiff's predecessor-in-title developed plans to expand the parking area behind the Testa property and the Coopersmith property. The expansion included the construction of a concrete wall that would prevent the owners of the Coopersmith property from accessing the rear of their property in the manner they were accustomed.

8. Philip and Nathan Sanborn were the owners of the Coopersmith property at the time of the proposed construction of the concrete wall. In the 1970's, Catherine Riccardo was the record owner of the Tourmaline property, which abutted the Coopersmith property along Main Street. Ms. Riccardo's daughter, Joan Purcell, operated a retail business out of the building on the Tourmaline property.

9. Soon after learning of the proposed construction of the concrete wall, Philip and Nathan Sanborn, together with Joan Purcell and Catherine Riccardo, commenced a lawsuit on September 9, 1977, in Hancock County Superior Court against Joseph and Michael Testa, the then owners of the Testa property, in an effort to prevent the construction of the concrete wall (the Lawsuit). They alleged that the construction would interfere with their rights of way, and their ability to access the rear of their property as they and their predecessors had done historically. On September 29, 1977, the court entered a temporary restraining order prohibiting the defendants in the case (the Testas) from interfering with the access of the plaintiffs (in the Lawsuit) to their property.

10. During the course of the Lawsuit, through their attorneys, the Sanborns and Riccardo negotiated an agreement with Joseph and Michael Testa, Jr., (through their attorneys), by which

3

agreement the Sanborns and Riccardo would be able to continue to access the rear of their properties over a portion of the Testa property.

11. Joseph Testa, Michael Testa, Jr., Philip Sanborn, and Nathan Sanborn signed the agreement in June 1978. Other than the dismissal of the case in October 1980, the Hancock County Superior Court's record does not reflect any court activity after the execution of the agreement by the Sanborns and the Testas. Catherine Riccardo did not sign the agreement. Ms. Riccardo's failure to sign the agreement was not the result of any objection that she had to the terms of the agreement. Given that the parties undertook no further action regarding the lawsuit after June 1978, and given that after June 1978, Ms. Purcell, Ms. Riccardo's daughter and the occupant of the parcel owned by Ms. Riccardo, accessed the rear of the Tourmaline property over the Testa property in accordance with the agreement without any objection from Joseph and Michael Testa, all parties to the Lawsuit, including Ms. Riccardo, assented to the terms of the June 1978 agreement.

12. The Hancock County Superior Court dismissed the lawsuit on October 15, 1980, pursuant to M.R. Civ. P. 41(b) for failure to prosecute the Lawsuit.

13. After the execution of the agreement in 1978, the Sanborns and Ms. Purcell accessed the rear of their properties over the Testa property in a manner consistent with the parties' June 1978 agreement.

14. In or about 2010, the Town of Bar Harbor passed an ordinance that eliminated the need for businesses to have a minimum amount of parking space available for customers. This change made the parking area behind the Coopersmith property and the Tourmaline property available for potential development.

4

15. From time to time after their purchase of the Coopersmith property, Defendants' ability to access their property from the rear of the building has been hindered.

## DISCUSSION

In this action, both parties request that the Court enter a declaratory judgment regarding Defendants' assertion of an easement over Plaintiff's property for the benefit of the Coopersmith property and the Tourmaline property. Defendants also seek to recover damages for Plaintiff's alleged nuisance and unreasonable interference with Plaintiff's easement rights. The Court will first address the parties' request for declaratory judgment.

At trial, both parties presented evidence regarding the right of way or easement language in the chain of title to the Coopersmith property and the Tourmaline/Purcell properties. Defendants also maintain that the deeds to the Coopersmith and Tourmaline/Purcell properties contain express easements, which granted rights of way over the Testa property. In addition, the parties submitted evidence as to the historical use of the parking area behind the Coopersmith and Tourmaline/Purcell properties. Through the historical evidence, Defendants attempt to establish the existence of a prescriptive easement and an implied easement over the Testa property.

A. *The June 1978 Agreement*

Defendants' predecessors-in-title commenced the Lawsuit as the result of the efforts of Plaintiff's predecessors-in-title to construct a concrete wall that would prevent Defendants' predecessors-in-title from accessing their property over the Testa property. In the Lawsuit, Defendants, Ms. Riccardo and Ms. Purcell maintained that they had a legal right to cross the Testa property to access Defendants' property. The evidence and common sense establish that

5

the parties negotiated a resolution of the Lawsuit through an agreement that would allow Plaintiff's predecessor-in-title to complete construction of the parking lot, including the proposed concrete wall, and which agreement would also allow Defendants' predecessor-in-title to continue to have access to the rear of their properties. Indeed, Plaintiffs have offered no logical explanation for the failure of the plaintiffs in the Lawsuit to continue prosecuting the Lawsuit without confirming their ability to continue to gain access to their properties as they had prior to the proposed construction of the wall. Consistent with this conclusion, the Court record contains no reference to any substantive action in the case after the Testas and Sanborns signed the agreement in June 1978. Given that the parties' reached a resolution of the access issues to resolve the Lawsuit, the parties' failure to object to the dismissal of the action pursuant to M.R. Civ. P. 41(b) is not surprising.

Despite the fact that Plaintiffs' predecessors-in-title signed the June 1978 agreement that ended the lawsuit, Plaintiffs contend that the agreement is not valid because Catherine Riccardo did not sign the agreement. First, Ms. Riccardo's signature was not necessary to establish an enforceable agreement between the Testas and the Sanborns. In other words, the Testas and the Sanborns are the only necessary parties to establish an easement over the Testa property for the benefit of the Coopersmith property. Thus, all parties necessary to establish an easement over the Testa property for the benefit of the Coopersmith property signed the agreement.[4]

Furthermore, if Ms. Riccardo's assent to the agreement is necessary, the Defendants have established that she consented to the terms of the agreement. In essence, Plaintiff argues that even though its predecessors-in-title, Joseph Testa and Michael Testa, Jr., negotiated and signed the agreement, acted in accordance with and abided by the terms of the agreement, the Court

---

[4] Insofar as Defendants Coopersmith now own both the Coopersmith and Tourmaline properties, a right of way over the Testa property for the benefit of the Coopersmith property effectively would allow Defendants Coopersmith to access both properties.

6

should invalidate the agreement because Ms. Riccardo did not sign and thereby did not consent to the terms of the agreement.

The absence of Ms. Riccardo's signature on the agreement is not the result of her objection to any of the terms of the agreement. In fact, there is no evidence that Ms. Riccardo expressed to any person that she had any concerns about the terms of the agreement.

The evidence in fact demonstrates that Ms. Riccardo consented to and, through her daughter (Joan Purcell) who occupied the property and was a party to the Lawsuit, endorsed and acted in accordance with the terms of the agreement. Ms. Riccardo was an owner of the property in name only. Ms. Riccardo's daughter, Joan Purcell, transferred the property to Ms. Riccardo as part of her effort to protect the asset should her husband incur any future liability.[5] Ms. Purcell, who occupied the Tourmaline property at all pertinent times, testified that she understood that the parties ended the lawsuit with an agreement that permitted her to access the rear of the property from Main Street over the Testa property. Ms. Purcell continued to operate a business out of the property until she sold the property to Defendants Coopersmith in 2012. While occupying the Tourmaline property, in accordance with the terms of the June 1978 agreement, Ms. Purcell continuously accessed the rear of the property from Main Street over the Testa property. Simply stated, Plaintiff's contention that the agreement is invalid because Ms. Riccardo did not assent to the terms of the agreement is not supported by competent, reliable evidence.

As mentioned above, Defendants also argued that they have an express easement by virtue of the language in the deeds to the Coopersmith and Tourmaline properties. The express

---

[5] Ms. Purcell testified that after her husband had been involved in a motor vehicle accident, she became concerned that if her husband were involved in a future accident in which a person was injured, the property could be at risk. She testified, therefore, that she transferred the property to her mother to avoid exposure for any claims that might arise as the result of her husband's future conduct.

7

easement language in the deeds does not grant to Defendants access to the rear of their properties from Main Street over the Testa property. At most, the deeds contain easements that grant access over the Testa property from the rear of the properties. While the Court cannot conclude that the express language in the deeds is controlling, the inclusion of the easement language in the deeds further convinces that Court that the parties reached a binding agreement by which Defendants' predecessors-in-title could continue to access their property. In the Court's view, the deed language, as well as use consistent with the existence of the easement, provided Defendants' predecessors-in-title with a compelling argument in support of their request for injunctive relief in the Lawsuit. Plaintiff's predecessor-in-title faced the possibility that the Lawsuit could end with an injunction prohibiting the expansion of the parking area. A reasonable person in the position of Plaintiffs' predecessors-in-title would recognize that risk, and seek to resolve the Lawsuit in a way that permitted expansion of the parking area and construction of the concrete wall.[6]

Plaintiff also argues that because Ms. Riccardo did not sign the agreement, the statute of frauds bars enforcement of the agreement. 33 M.R.S. § 51(4) (2012) provides in pertinent part that "No action shall be maintained in any of the following cases … [u]pon any contract for the sale of lands, tenements or hereditaments, or of any interest in or concerning them … unless the promise, contract or agreement on which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith …"

---

[6] Plaintiff has argued that Defendants' predecessors-in-title abandoned any express easement through non-use. The "non-use" occurred following execution of the June 1978 agreement. The construction of the concrete wall rendered use of the easement impossible. Defendants, therefore, did not abandon the easement. Instead, the parties simply agreed to relocate the easement, which is permissible. *See Davis v. Bruk*, 411 A.2d 660 (Me. 1980) (easement can be relocated by mutual consent of the owners of the dominant and servient estates).

8

Plaintiff's statute of frauds argument is essentially a reiteration of its contention that the agreement is invalid because Ms. Riccardo did not sign the agreement. Contrary to Plaintiff's argument, there is an agreement signed by "the party charge therewith ..." That is, the owners of the property to be burdened by the right of way (i.e., Michael and Joseph Testa) signed the agreement and agreed to bound by its terms. Plaintiff's statute of frauds issue fails for that reason.

Furthermore, the purpose of the statute of frauds is not to invalidate meritorious claims. Rather, "[t]he purpose of the statute of frauds is to prevent actions based on false claims." *Brown Development Corp. v. Hemond*, 2008 ME 146, ¶ 11, 956 A. 2d 104, 108 (citing, *Wells Fargo Home Mortgage, Inc., v. Spaulding*, 2007 ME 116, ¶ 20, 930 A.2d 1025, 1030; *Dehahn v. Innes*, 356 A.2d 711, 717 (Me. 1976)). The law recognizes that the statute of frauds should not be a shield for a party to avoid a clear obligation to which the party plainly consented, and for which the party received valuable consideration.[7] In this case, despite the existence of a writing signed by its predecessor-in-title, Plaintiff attempts to void Defendants' right of access, for which right Plaintiff's predecessor-in-title received valuable consideration (i.e., the end of the Lawsuit which permitted the expansion of the parking lot and the construction of the concrete wall). As explained above, the lack of Ms. Riccardo's signature does not invalidate the agreement. In short, the agreement satisfies the writing requirement of the statute of frauds. ("almost any writing is sufficient for statute of frauds purposes" *Brown Development Corp.*, 2008 ME 146, ¶ 12).

---

[7] In *Chapman v. Bowman*, 381 A.2d 1123, 1128 (Me. 1978), the Law Court, in adopting and applying the "broad formulation of the doctrine of promissory estoppel set forth in the .... Restatement (Second) of Contracts," observed, "since it is the purpose of the Statute of Frauds to prevent fraud, that Statute cannot be permitted to be itself an instrument of fraud."

9

Plaintiff has asserted that if the June 1978 agreement is valid, it only conveyed a personal license to the Sanborns. In other words, Plaintiff contends that the interest did not run with the land and, therefore, Defendants are not the beneficiaries of the right of way. "The construction of language creating an easement is a question of law." *Anchors v. Manter*, 1998 ME 152, ¶ 16, 714 A.2d 134, 138 (citing, *Fine Line, Inc. v. Blake*, 677 A.2d 1061, 1063 (Me. 1996)).[8] The legal question is whether in the Court's view, Defendants obtained an appurtenant easement over the Testa property or whether their predecessors merely obtained an easement personal to the grantees.[9]

"The traditional rules of construction for grants or reservations of easements require that whenever possible an easement be fairly construed to be appurtenant to the land of the person for whose use the easement is created." *Anchors v. Manter*, 1998 ME 152, ¶ 10, 714 A.2d 134, 138 (quoting, *LeMay v. Anderson*, 397 A.2d 984, 987 (Me. 1979)). Not insignificantly, the expert witnesses for both the Plaintiff and Defendants opined that if valid, the agreement conveyed an appurtenant easement. The indicia of an appurtenant easement are clearly present in the agreement. Perhaps most importantly, use of the right of way as expressed in the agreement is not limited to a specific person or persons, which is an essential distinguishing feature between

---

[8] Plaintiff argued that the agreement could be read to convey a license, and, therefore, the agreement was ambiguous and Plaintiff should be able to present the testimony of the Testas' counsel as to his intent when drafting the agreement. Given that the expert witnesses for the Plaintiff and Defendants agreed that the agreement conveyed an appurtenant easement, and given the plain language of the agreement, the Court determined, contrary to Plaintiff's argument, that the agreement was not ambiguous. In addition, the Court was not convinced that the intent of the Testas' counsel in drafting the agreement was relevant. The Court, therefore, excluded the testimony of Testas' counsel.

[9] "The law recognizes two different types of easements or rights of use over the property of another: easements appurtenant and easements in gross. Grantors create easements appurtenant to benefit a dominant estate and such easements run with the land. To be appurtenant, the easement must be attached or related to a dominant estate. In contrast, easements in gross are personal interests in land or the right to use another's land. They are not appurtenant to any estate in land and do not belong to any person by virtue of his ownership of an estate in other land. An easement in gross is generally not assignable and terminates upon the death of the grantee." *Wentworth v. Sebra*, 2003 ME 97, ¶¶ 12, 13, 829 A.2d 520, 524.

an easement in gross (i.e., a personal easement) and an easement appurtenant. *Wentworth v. Sebra*, 2003 ME 97, ¶¶ 12, 13, 829 A.2d 520, 524. In particular, the agreement provided that the right of way could be used by the "[Sanborns' and Riccardo's'] immediate families, for delivery purposes or persons occupying said land of Sanborn and Riccardo under a written lease." In the Court's view, consistent with the only expert testimony presented at trial, this language plainly creates an interest that benefitted the Coopersmith property and the Tourmaline property and was not, as Plaintiff argues, an interest granted only to Philip Sanborn, Nathan Sanborn and Catherine Riccardo.

Plaintiff also argues that in the event the Court determines that the parties entered into a binding agreement in June 1978, the agreement is terminated because Defendants abused the easement. In support of its contention, Plaintiff cites the term of the June 1978 agreement that provides, "[a]ny abuse of the access given hereunder by Sanborn [Defendants' predecessor] or Riccardo shall terminate and cancel this Agreement with respect to the party abusing said access.]" Plaintiff asserts that Defendants abused the easement because either Defendants or those performing work for Defendants parked in or used portions of the parking area that were beyond the scope of Defendants' rights of access.

Plaintiff's argument is unpersuasive. Plaintiff presented photographs that depicted the temporary use in May 2013 of portions of the parking area by contractors or others who were arguably Defendants' agents. Even if Plaintiff were to prove that Defendants were responsible for some or all of the use of the parking lot as depicted on the photographs, Plaintiff has not established sufficient grounds to terminate the agreement. The agreement does not permit termination in the event of isolated, limited, use that might extend beyond the use contemplated

11

by the agreement. The fact that the conduct occurred well before the tourist season began in earnest further convinces the Court that the alleged conduct does not constitute abuse.

## B. *Prescriptive Easement/Implied Easement*

Defendants alternatively maintain that they acquired an easement by prescription over the Testa property. "[T]he party asserting an easement by prescription must prove continuous use for at least 20 years under a claim of right adverse to the owner, with his knowledge and acquiescence, or a use so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed." *Town of Manchester v. Augusta Country Club*, 477 A.2d 1124, 1130 (Me. 1984) (citation omitted). Acquiescence implies "passive assent or submission to the use, as distinguished from the granting of a license or permission given with the intention that the licensee's use may continue only as long as the owner continues to consent to it." *Pace v. Carter*, 398 A.2d 505, 507 (Me. 1978).

As explained earlier, the Court believes that Defendants' predecessors-in-title had a right of way, which they exercised until resolution of the Lawsuit, which they initiated after Plaintiff's predecessor-in-title decided to expand the parking area and construct a concrete wall. Even if the Court found that the June 1978 agreement did not bind the parties, Defendants have demonstrated the existence of a prescriptive easement, by which Defendants would continue to access their property. The evidence at trial overwhelmingly established that for more than 20 years before the Lawsuit, and for the years after the Lawsuit until the dispute that resulted in this action, Defendants' predecessors-in-title, delivery companies, and individuals regularly, consistently, and without objection from Plaintiff's predecessors-in-title, accessed the Coopersmith and Tourmaline properties over the Testa property. The Court concludes, therefore, that even if Defendants had not persuaded the Court that the June 1978 agreement was

12

valid and binding upon the parties, Defendants would have an easement by prescription over the Testa property.[10]

## C. Nuisance

In their counterclaim, Defendants assert claims of nuisance and unreasonable interference with easement rights. To prevail on their common law nuisance claim, Defendants must establish that "(1) the [counterclaim] defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial ... The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct; and (4) the interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land." *Charlton v. Town of Oxford*, 2001 ME 104, ¶ 36, 774 A.2d 366, 377.

Here, while Defendants introduced evidence that on occasion one of Plaintiff's employees parked in an area that interfered with Defendants' ability to access their property, the Court is not convinced that Plaintiff's employee acted at the direction of the Plaintiff in an effort to interfere with Defendants' access. In addition, Defendants have not proven by competent, reliable evidence that they have suffered monetary damages, including a diminution in value of

---

[10] Defendants also assert that they have access to their properties over the Testa property by virtue of an implied easement. While the Court believes that Defendants and their predecessors-in-title have had access over the Testa property for a sufficient period of time and under circumstances to establish an easement by prescription, the Court is not convinced that at the time that the common owner of the properties divided the properties, the use was such that "it is reasonable to infer that the parties to the conveyance intended that the use continue." *McGeechan v. Sherwood*, 2000 ME 188, ¶ 57, 760 A.2d 1068, 1080. The Court, therefore, determines that Defendants do not have an implied easement over Plaintiff's property.

13

Defendants' property, as the result of Plaintiff's interference with Defendants' access. Defendants, therefore, cannot prevail on their nuisance claim. For the same reasons, Defendants cannot prevail on their claim of unreasonable interference with their easement rights.

## CONCLUSION

Based on the foregoing analysis, the Court orders:

1. On the parties' request for declaratory judgment, the Court determines that the June 1978 agreement grants an appurtenant easement from Main Street over the Testa property to the rear of the Cooopersmith property and the Tourmaline property, which easement is for the benefit of the Coopersmith property and the Tourmaline property. The Court also determines that Defendants acquired an easement by prescription over the Testa property, which easement is for the benefit of the Coopersmith property and the Tourmaline property. The Court further determines that Defendants do not have an implied easement over the Testa property.

2. On Counts II and III of Defendants' Counterclaim, the Court enters judgment in favor of Plaintiff and against Defendants.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Judgment into the docket by reference.

Date: 11/22/13

Justice, Maine Business & Consumer Court

14

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                                   Location:    Portland
                                                  Docket No.   BCD-RE-11-03


TESTA'S, INC.,

        Plaintiff/Counterclaim Defendant,


        v.                                        **DECISION AND JUDGMENT**


JACK COOPERSMITH, et al.,

        Defendants/Counterclaim Plaintiffs,

and


THOMAS J. TESTA, JR., ANNA T. STRIEFEL,
MLS PROPERTIES, LLC, and JOAN PURCELL,

        Parties-in-Interest


        On September 9 – 11, 2013, this matter was tried to the Court on Plaintiff's Complaint

and Defendants' Counterclaim. The central issue generated by the complaint and counterclaim is

whether Defendants' property benefits from an easement over Plaintiff's property in Bar Harbor,

Maine.[1] After consideration of the evidence, the Court makes the following findings:

Findings of Fact[2]

        1. Plaintiff owns certain real property located on Main Street in Bar Harbor, Maine,

which consists of several contiguous lots (the Testa property).

---

[1] At the trial, Plaintiff withdrew its claim under the Unfair Trade Practices Act.
[2] The Court will set forth some of the basic facts established at trial. The enumerated facts are not, however, an exhaustive list of all of the Court's factual findings. As part of the Court's analysis in the Discussion section that follows, the Court makes additional findings.


1

2. Defendants also own certain property on Main Street in Bar Harbor, Maine, which property they acquired by deed dated November 1, 2005 (the Coopersmith property).

3. The Coopersmith property includes a retail business with space for parking immediately behind the building.

4. The deed to the prior owners of the Coopersmith property included a right of way over adjoining property, at least a portion of which is now the Testa property, to permit access to the rear of the Coopersmith property. The Coopersmiths' deed also includes a grant of a right of way.

5. The Coopersmiths' predecessors-in-title accessed the rear of their property over the Testa property for business deliveries and other purposes.

6. In the 1970's, Plaintiff's predecessor-in-title developed plans to expand the parking area behind the Testa property and the Coopersmith property. The expansion included the construction of a concrete wall that would prevent the owners of the Coopersmith property from accessing the rear of their property in the manner they were accustomed.

7. Philip and Nathan Sanborn were the owners of the Coopersmith property at the time of the proposed construction of the concrete wall. Catherine Riccardo was the record owner of real property that abutted the Coopersmith property along Main Street. Ms. Riccardo's daughter, Joan Purcell, operated a retail business out of the building on the property (the Purcell property).

8. Philip and Nathan Sanborn, together with Joan Purcell and Catherine Riccardo, commenced a lawsuit on September 9, 1977, in Hancock County Superior Court against Joseph and Michele Testa, the then owners of the Testa property, in an effort to prevent the construction of the concrete wall (the lawsuit). They alleged that the construction would interfere with their rights of way. On September 29, 1977, the court entered a temporary restraining order

2

prohibiting the defendants in the case (the Testas) from interfering with the access of the plaintiffs to their property.

9. During the course of the lawsuit, the Sanborns and Riccardo negotiated an agreement with Joseph and Michele Testa, Jr., by which agreement the Sanborns and Riccardo would be able to access the rear of their properties over a portion of the Testa property.

10. Joseph Testa, Michele Testa, Jr., Philip Sanborn, and Nathan Sanborn signed the agreement in June 1978. The court's record does not reflect any court activity after the execution of the agreement by the Sanborns and the Testas. Catherine Riccardo did not sign the agreement. Ms. Riccardo's failure to sign the agreement was not the result of any objection that she had to the terms of the agreement. Given that the parties undertook no further action regarding the lawsuit after June 1978, and given that after June 1978, Ms. Purcell, the occupant of the parcel owned by Ms. Riccardo, accessed the rear of the Purcell property over the Testa property, Ms. Riccardo assented to the terms of the June 1978 agreement.

11. The Hancock County Superior Court dismissed the lawsuit on October 15, 1980, pursuant to M.R. Civ. P. 41(b) for failure to prosecute the lawsuit.

12. After the execution of the agreement in 1978, the Sanborns, their successors-in-title, and Ms. Purcell accessed the rear of their property over the Testa property in a manner consistent with the parties' agreement.

13. The deeds in the chain of title to the Coopersmith property and the Purcell property include language that provides for a right of way over a portion of the parking area currently owned by Plaintiff.

14. In or about 2010, the Town of Bar Harbor passed an ordinance that eliminated the need for businesses to have a minimum amount of parking space available for customers. This

3

change made the parking area behind the Coopersmith property and the Purcell property available for potential development.

15. From time to time after their purchase of the Coopersmith property, Defendants' ability to access their property from the rear of the building has been hindered.

Discussion

In this action, both parties request that the Court enter a declaratory judgment regarding Defendants' assertion of an easement over Plaintiff's property for the benefit of the Coopersmith property. Defendants also seek to recover damages for Plaintiff's alleged nuisance and unreasonable interference with Plaintiff's easement rights. The Court will first address the parties' request for declaratory judgment.

At trial, both parties presented evidence regarding the right of way or easement language in the chain of title to the Coopersmith property and the Purcell property. In addition, the parties submitted evidence as to the historical use of the parking area behind the Coopersmith and Purcell properties. Through the historical evidence, Defendants attempt to establish the existence of a prescriptive easement over the Testa property. As explained below, after consideration of the evidence, the Court concludes that Defendants have an appurtenant easement over the Testa property from Main Street to the rear of the Coopersmith property as the result of the June 1978 agreement by which the parties' predecessors in title resolved the lawsuit.[3]

The lawsuit was commenced as the result of the efforts of Plaintiff's predecessors-in-title to construct a wall that would prevent Defendants' predecessors-in-title from accessing their property over the Testa property. In the lawsuit, Defendants, Ms. Riccardo and Ms. Purcell

---

[3] Because the Court concludes that the parties' agreed to an express easement in June 1978, the Court does not address Defendants' contention that they have an express easement by deed, a prescriptive easement, or a quasi-easement.

4

maintained that they had a legal right to cross the Testa property to access Defendants' property. The only logical conclusion is that the parties negotiated a resolution of the lawsuit, which agreement would allow Plaintiff's predecessor-in-title to complete construction of the parking lot, including the wall, and allow Defendants' predecessor-in-title to continue to have access to the rear of their property. Consistent with this conclusion, the Court record contains no reference to any substantive action in the case after the Testas and Sanborns signed the agreement in June 1978. Given that the parties' reached a resolution of the access issues to resolve the lawsuit, the parties' failure to object to the dismissal of the action pursuant to M.R. Civ. P. 41(b) is not surprising.

Despite the fact that Plaintiffs' predecessors-in-title signed the June 1978 agreement that ended the lawsuit, Plaintiffs contend that the agreement is not valid because Catherine Riccardo did not sign the agreement. First, Ms. Riccardo's signature was not necessary to establish an enforceable agreement between the Testas and the Sanborns. In other words, the Testas and the Sanborns are the only necessary parties to establish an easement over the Testa property for the benefit of the Coopersmith property. Thus, all parties necessary to establish an easement over the Testa property for the benefit of the Coopersmith property signed the agreement.

Furthermore, if Ms. Riccardo's assent to the agreement was necessary, the Defendants have established that she consented to the terms of the agreement. In essence, Plaintiff argues that even though its predecessors-in-title, Joseph Testa and Michele Testa, Jr., negotiated and signed the agreement, acted in accordance with and abided by the terms of the agreement, the Court should invalidate the agreement because Ms. Riccardo did not sign and thereby did not consent to the terms of the agreement.

5

The absence of Ms. Riccardo's signature on the agreement is not the result of her objection to any of the terms of the agreement. Indeed, there is no evidence that Ms. Riccardo expressed to any person that she had any concerns about the terms of the agreement.

The evidence in fact demonstrates that Ms. Riccardo consented to and, through her daughter who occupied the property, endorsed and acted in accordance with the terms of the agreement. Ms. Riccardo was an owner of the property in name only. Ms. Riccardo's daughter, Joan Purcell, transferred the property to Ms. Riccardo as part of her effort to protect the asset should her husband incur any future liability.[4] Ms. Purcell, who occupied the Purcell property at all pertinent times, testified that she understood that the parties ended the lawsuit with an agreement that permitted her to access the rear of the property from Main Street over the Testa property. Ms. Purcell continued to operate a business out of the property until she sold the property to Defendants in 2012. While occupying the Purcell property, in accordance with the terms of the June 1978 agreement, Ms. Purcell continuously accessed the rear of the property from Main Street over the Testa property. Simply stated, Plaintiff's contention that the agreement is invalid because Ms. Riccardo did not assent to the terms of the agreement is not supported by competent, reliable evidence.

In this case, Plaintiff has asserted that if the June 1978 agreement is valid, it only conveyed a personal license to the Sanborns. That is, Plaintiff contends that the interest did not run with the land and, therefore, Defendants are not the beneficiaries of the right of way. "The construction of language creating an easement is a question of law." *Anchors v. Manter*, 1998 ME 152, ¶ 16, 714 A.2d 134, 138 (citing, *Fine Line, Inc. v. Blake*, 677 A.2d 1061, 1063 (Me.

---

[4] Ms. Purcell testified that after her husband had been involved in a motor vehicle accident, she became concerned that if her husband were involved in a future accident in which a person was injured, the property could be at risk. She testified, therefore, that she transferred the property to her mother to avoid exposure for any claims that might arise as the result of her husband's future conduct.

6

1996)).[5] The legal question is whether in the Court's view, Defendants obtained an appurtenant easement over the Testa property or whether their predecessors merely obtained an easement personal to the grantees.[6]

"The traditional rules of construction for grants or reservations of easements require that whenever possible an easement be fairly construed to be appurtenant to the land of the person for whose use the easement is created." *Anchors v. Manter*, 1998 ME 152, ¶ 10, 714 A.2d 134, 138 (quoting, *LeMay v. Anderson*, 397 A.2d 984, 987 (Me. 1979)). Not insignificantly, the expert witnesses for both the Plaintiff and Defendants opined that if valid, the agreement conveyed an appurtenant easement. The indicia of an appurtenant easement are clearly present in the agreement. Perhaps most importantly, use of the right of way as expressed in the agreement is not limited to a specific person or persons, which is an essential distinguishing feature between a easement in gross (i.e., a personal easement) and an easement appurtenant. *Wentworth v. Sebra*, 2003 ME 97, ¶¶ 12, 13, 829 A.2d 520, 524. In particular, the agreement provided that the right of way could be used by the "[Sanborns' and Riccardo's'] immediate families, for delivery purposes or persons occupying said land of Sanborn and Riccardo under a written lease." In the Court's view, consistent with the only expert testimony presented at trial, this language plainly

---

[5] Plaintiff argued that the agreement could be read to convey a license, and, therefore, the agreement was ambiguous and Plaintiff should be able to present the testimony of the Testas' counsel as to his intent when drafting the agreement. Given that the expert witnesses for the Plaintiff and Defendants agreed that the agreement conveyed an appurtenant easement, and given the plain language of the agreement, the Court determined, contrary to Plaintiff's argument, that the agreement was not ambiguous. In addition, the Court was not convinced that the intent of the Testas' counsel in drafting the agreement was relevant. The Court, therefore, excluded the testimony of Testas' counsel.

[6] "The law recognizes two different types of easements or rights of use over the property of another: easements appurtenant and easements in gross. Grantors create easements appurtenant to benefit a dominant estate and such easements run with the land. To be appurtenant, the easement must be attached or related to a dominant estate. In contrast, easements in gross are personal interests in land or the right to use another's land. They are not appurtenant to any estate in land and do not belong to any person by virtue of his ownership of an estate in other land. An easement in gross is generally not assignable and terminates upon the death of the grantee." *Wentworth v. Sebra*, 2003 ME 97, ¶¶ 12, 13, 829 A.2d 520, 524.

7

creates an interest that benefitted the Coopersmith property and the Purcell property and was not, as Plaintiff argues, an interest granted only to Philip Sanborn, Nathan Sanborn and Catherine Riccardo.

Plaintiff also argues that in the event the Court determines that the parties entered into a binding agreement in June 1978, the agreement is terminated because Defendants abused the easement. In support of its contention, Plaintiff cites the term of the June 1978 agreement that provides, "[a]ny abuse of the access given hereunder by Sanborn [Defendants' predecessor] or Riccardo shall terminate and cancel this Agreement with respect to the party abusing said access.]" Plaintiff asserts that Defendants abused the easement because either Defendants or those performing work for Defendants parked in or used portions of the parking area that were beyond the scope of Defendants' rights of access.

Plaintiff's argument is unpersuasive. Plaintiff presented photographs that depicted the temporary use in May 2013 of portions of the parking area by contractors or others who were arguably Defendants' agents. Even if Plaintiff were to prove that Defendants were responsible for some or all of the use of the parking lot as depicted on the photographs, Plaintiff has not established sufficient grounds to terminate the agreement. The agreement does not permit termination in the event of isolated, limited, use that might extend beyond the use contemplated by the agreement. The fact that the conduct occurred well before the tourist season began in earnest further convinces the Court that the alleged conduct does not constitute abuse.

In their counterclaim, Defendants assert claims of nuisance and unreasonable interference with easement rights. To prevail on their common law nuisance claim, Defendants must establish that "(1) the [counterclaim] defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the

8

use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial ... The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct; and (4) the interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land." *Charlton v. Town of Oxford*, 2001 ME 104, ¶ 36, 774 A.2d 366, 377.

Here, while Defendants introduced evidence that on occasion one of Plaintiff's employees parked in an area that interfered with Defendants' ability to access their property, the Court is not convinced that Plaintiff's employee acted at the direction of the Plaintiff in an effort to interfere with Defendants' access. In addition, Defendants have not proven by competent, reliable evidence that they have suffered monetary damages, including a diminution in value of Defendants' property, as the result of Plaintiff's interference with Defendants' access. Defendants, therefore, cannot prevail on their nuisance claim. For the same reasons, Defendants cannot prevail on their claim of unreasonable interference with their easement rights.

Conclusion

Based on the foregoing analysis, the Court orders:

1. On the parties' request for declaratory judgment, the Court determines that the June 1978 agreement grants an appurtenant easement from Main Street over the Testa property to the rear of the Cooopersmith property and the Purcell property, which easement is for the benefit of the Coopersmith property and the Purcell property.

9

2. On Counts II and III of Defendants' Counterclaim, the Court enters judgment in favor of Plaintiff and against Defendants.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Judgment into the docket by reference.

Date: 10/1/13

_____
Justice, Maine Business & Consumer Court

Entered on the Docket: 10·1·13
Copies sent via Mail ___ Electronically ✓